UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NHUAN CAM LU,

                Petitioner,

-against-

KENNETH GENALO, Field Office Director, New York Field Office Enforcement and Removal, Immigration & Customs Enforcement, TODD M. LYONS, Acting Director, Immigration & Customs Enforcement; KRISTI NOEM, Director, Department of Homeland Security,

                Respondents.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/8/2025

25 Civ. 7161 (AT)

**ORDER**

ANALISA TORRES, District Judge:

Petitioner, Nhuan Cam Lu, petitions for a writ of habeas corpus under 28 U.S.C. § 2241, challenging the lawfulness of his detention by Immigration and Customs Enforcement ("ICE"). *See generally* Pet. (the "Petition"), ECF No. 1. Lu contends his Fifth Amendment right to due process has been violated as a result of his detention since August 28, 2025. *See id.* ¶ 15. Lu seeks immediate release, arguing that there is no reasonable likelihood of removal to Vietnam. *Id.* ¶ 1; *see Zadvydas v. Davis*, 533 U.S. 678, 699 (2001). For the reasons stated below, the Petition is GRANTED IN PART. Specifically, although the Court does not find that there is no reasonable likelihood of removal to Vietnam, the Court agrees that under the specific circumstances present here, Lu's continued detention without a bond hearing violates his Fifth Amendment due process rights.

**BACKGROUND**

Over thirty years ago, in May 1979, Lu was admitted to the United States as a refugee from Vietnam. Mascia Decl. ¶ 3, ECF No. 15; Pet. ¶ 8. In April 1983, Lu's refugee status was adjusted

to lawful permanent resident. Mascia Decl. ¶ 3. Ten years later, Lu was convicted in Pennsylvania state court of a firearms offense and was charged as deportable pursuant to § 241(a)(2)(C) of the Immigration and Nationality Act ("INA").[1] *Id.* ¶¶ 4–5. Following removal proceedings, an immigration judge ordered Lu removed to Vietnam. *Id.* ¶ 6; Pet. ¶ 8. After the Board of Immigration Appeals ("BIA") dismissed Lu's appeal in August 1993, Lu's removal order became administratively final. Mascia Decl. ¶ 7; Pet. ¶ 9.

In August 1999, after approximately eight years of incarceration in Pennsylvania, Lu was taken into custody by ICE for the purpose of executing the final removal order. Mascia Decl. ¶ 9. The government, however, could not remove him because Vietnam refused to issue travel documents for his repatriation. Mascia Decl. ¶ 10; Pet. ¶ 14. Eight months later, in April 2000, ICE released Lu from custody on an Order of Supervision ("OSUP"). Mascia Decl. ¶ 10. ICE has historically had limited success in obtaining travel documents for Vietnamese nationals like Lu who arrived in the United States prior to July 12, 1995. *Id.* ¶ 11. According to the government, when Lu was released on the OSUP, an ICE policy guidance was in effect, which concluded that there was generally no significant likelihood of removal to Vietnam for such individuals. *Id.* Lu remained at liberty on his OSUP. *Id.*

On June 9, 2025, ICE apparently rescinded this policy guidance. *Id.* ¶ 12. The government reports that, based on its review of ICE's electronic records and databases, in the 2025 fiscal year, the Vietnamese government issued travel documents for 296 individuals who entered the United States before 1995, although the government did not specify how long it took ICE's requests to be granted.[2] Quizhpi Decl. ¶ 6, ECF No. 25-1. In the past, Lu has sought travel documents from the

---

[1] This provision has since been renumbered as INA § 237(a)(2)(C) and is codified at 8 U.S.C. § 1227(a)(2)(C).
[2] In the 2025 fiscal year, ICE requested travel documents for 448 Vietnamese individuals, of which 327 requests were for people who arrived in the United States before 1995. Quizhpi Decl. ¶ 6. The declaration does not specify

2

Vietnamese embassy without success. Pet. ¶¶ 13–14. Lu arranged for a visit to the Vietnamese consulate and appeared there on June 10, 2025. The consulate clerk informed Lu that there are no records of him in their system. Liang Decl. ¶¶ 3, 9–10, ECF No. 16-1. From June to August 2025, Lu made several follow-up requests for another appointment but never received a response. *Id.* ¶¶ 10–16.

On August 28, 2025, Lu was taken into ICE custody after voluntarily appearing for his scheduled OSUP check-in at 26 Federal Plaza in Manhattan. Mascia Decl. ¶ 14. During the check-in, Lu stated he was amenable to deportation, and ICE served a Notice of Revocation of Release on him. *Id.*; *see also* Notice of Revocation of Release, ECF. No. 15-5. The notice provided that the reason for revocation was "changed circumstances . . . , specifically that ICE is acquiring a travel document on [Lu's] behalf and [Lu's] removal is now imminent." Notice of Revocation of Release at 1. ICE then interviewed Lu. Mascia Decl. ¶ 15. The interview notes state that "subject is completely rehabilitated" and has been "[r]eporting for 25 years." Informal Interview Notes at 1, ECF No. 15-6. Lu was then taken into custody, and the next day, transported to the Metropolitan Detention Center ("MDC"). Mascia Decl. ¶ 16; *see* 8 U.S.C. § 1231(a).

After Lu was detained for nearly a month, on September 22, 2025, ICE submitted a request to the Vietnamese embassy for his travel documents. Resp. Ltr. I, ECF No. 18. In their submissions to the Court, the government has repeatedly represented that "travel document requests typically take around 30 days for the Vietnamese embassy to process." *Id.*; *see* Mascia Decl. ¶ 20; Opp. Mem. at 5, ECF No. 14.

However, to date, over 75 days since the government asked the Vietnamese government for travel documents, and over 100 days since Lu was detained, Lu's travel documents have not

---

whether the 296 travel documents issued by the Vietnamese embassy were connected to these 327 requests, or whether the 296 number includes the fulfillment of requests that were submitted in a prior fiscal year.

3

issued.  By letter dated November 4, 2025, the government stated that it could not confirm whether Vietnamese authorities have records of Lu.  Resp. Ltr. II, ECF No. 20.  Nor could the government advise the Court of the expected time frame by which Lu's travel documents would be delivered.  *See generally id*.  By letter dated November 13, 2025, the government again did not state when the travel documents would issue but said that ICE has been informed that "an interview with [Lu] . . . is in the process of being scheduled."  Resp. Ltr. III, ECF No. 22.  On December 6, 2025, the government informed the Court that Lu's interview took place at 8:30 a.m. on November 24, 2025.  Quizhpi Decl. ¶ 3.  The government reports that the "expected time frame for the decision on the issuance of the travel documents" is December 13, 2025, and that "[i]f an interview is required," the Vietnamese government has "historically issued travel documents within thirty days from the time an interview is conducted by the Vietnamese consulate."  *Id.* ¶¶ 5, 9.

## DISCUSSION

### I.  Legal Framework

"[T]he Fifth Amendment entitles noncitizens to due process of law . . . . whether their presence here is lawful, unlawful, temporary, or permanent."  *Velasco Lopez v. Decker*, 978 F.3d 842, 850 (2d Cir. 2020).  "Noncitizens are also entitled to challenge through habeas corpus the legality of their ongoing detention."  *Id.*  "Habeas review is not limited to evaluating the lawfulness of detention when it is first imposed . . . but is also available to challenge whether, at some point, an ongoing detention has become unlawful."  *Id.*  "The Supreme Court has been unambiguous that executive detention orders, which occur without the procedural protections required in courts of law, call for the most searching review."  *Id.*

Lu is detained pursuant to 8 U.S.C. § 1231(a), which establishes that upon the issuance of a final order of removal, the person shall be removed "within a period of 90 days"—a time period

4

referred to as the "removal period"—and during that time, the person shall be detained. *Id.* §§ 1231(a)(1)(A), 1231(a)(2)(A).  If the person is not removed during that 90-day removal period, the person "pending removal, shall be subject to supervision under regulations prescribed by the Attorney General." *Id.* § 1231(a)(3).  However, certain noncitizens—for example, those, like Lu, who are removable for criminal offenses under 8 U.S.C. § 1227(a)(2), *see* BIA Decision, ECF No. 15-3—*may* continue to be detained beyond the 90-day removal period. *Id.* § 1231(a)(6).  Lu's 90-day removal period ended in 1999, after 90 days of detention following his release from custody on the Pennsylvania state offense. *See id.* § 1231(a)(1)(B)(iii).  Therefore, Lu's current detention is discretionary, not mandatory. *See id.* § 1231(a)(6).

The Fifth Amendment Due Process Clause limits the Attorney General's detention authority under § 1231(a)(6), permitting detention only for "a period reasonably necessary to secure removal." *Zadvydas*, 533 U.S. at 699.  "Thus, if removal is not reasonably foreseeable, the court should hold continued detention unreasonable and no longer authorized by statute." *Id.* at 699–700.  Judicial review of a reasonable period of detention "must take appropriate account of the greater immigration-related expertise of the Executive Branch" and "will often call for difficult judgments." *Id.* at 700.  In *Zadvydas*, the Court recognized a "presumptively reasonable period of detention" of six months. *Id.* at 701.

Additionally, even if release is not required under *Zadvydas*, a petitioner may be entitled to a bond hearing under the Fifth Amendment.  Although there is no statutory obligation to provide a bond hearing for detentions based on § 1231(a)(6), the Supreme Court has left open the question of whether constitutional due process may require a bond hearing for detention under that provision in certain circumstances. *See Cabrera Galdamez v. Mayorkas*, No. 22 Civ. 9847, 2023 WL 1777310, at *4 (S.D.N.Y. Feb. 6, 2023); *Johnson v. Arteaga-Martinez*, 596 U.S. 573, 583

5

(2022) (leaving for "lower courts" the question of whether and when a bond hearing is constitutionally required for detentions under § 1231(a)(6)). The Second Circuit has confirmed that even when a bond hearing is not required by statute, courts must consider whether a petitioner's ongoing detention poses due process concerns and whether additional procedural protections, such as a bond determination, have become constitutionally necessary. *See Velasco Lopez*, 978 F.3d at 853–54 (holding that a bond determination may be constitutionally required when discretionary detention under § 1226(a) becomes prolonged); *see also Black v. Decker*, 103 F.4th 133, 145 (2d Cir. 2024) (holding that a bond determination may become constitutionally required, even if the petitioner is subject to mandatory detention under § 1226(c)).

Specifically, courts in this Circuit evaluate procedural due process claims related to prolonged immigration detention under the three-factor balancing test set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976). *See, e.g.*, *Velasco Lopez*, 978 F.3d at 851; *Black*, 103 F.4th at 145–48. Under this test, courts consider "(1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the [g]overnment's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335. In adopting "the flexible *Mathews* framework to assess, case by case, whether an individual's prolonged . . . detention violates due process," the Second Circuit has declined to adopt a bright-line rule regarding the reasonableness of detention. *Black*, 103 F.4th at 150.

II.     Analysis

   A. *Zadvydas* Claim

Lu argues that he should be released because his final order of removal triggered the six-month period of reasonable detention under *Zadvydas*, which expired long ago. Pet. ¶¶ 26, 38; Reply at 3–6. By contrast, the government argues that Lu's presumptively reasonable period of detention under *Zadvydas* began when he was detained on August 28, 2025. Opp. Mem. at 9.

Although this point is not decisive, the Court briefly considers when the six-month period described in *Zadvydas* starts and ends. This question is not clearly answered by *Zadvydas*. The Supreme Court did not address the situation presented here, where a noncitizen was detained for eight months, released for a period of 25 years, and then, for a second time, subject to post-removal detention based on purportedly changed circumstances. However, "*Zadvydas* appears to have sought to balance the length of time a noncitizen would be held in detention against the need to afford the [g]overnment some time immediately following the issuance of the removal order to make and execute arrangements for removal." *Zavvar v. Scott*, No. Civ. 25-2104, 2025 WL 2592543, at *4 (D. Md. Sep. 8, 2025); *see also* Opp. Mem. at 15 ("Due process does not require that Petitioner be released while the logistics of his imminent removal are arranged."). There is, therefore, "a reasonable argument that the six-month period [in this case] runs continuously from [the date circumstances changed on June 9, 2025], even if the noncitizen is not detained throughout that period." *Zavvar*, 2025 WL 2592543, at *4; *see also Farez-Espinoza v. Chertoff*, 600 F. Supp. 2d 488, 499–500 (S.D.N.Y. 2009) (holding that "any presumptively reasonable six-month extended detention to which the [g]overnment may have been entitled expired" six months after a removal order was final, even though the individual was not detained).

Here, "the [g]overnment had a period of time . . . to make the arrangements for removal" even before Lu's August 2025 detention. *Zavvar*, 2025 WL 2592543, at *4. Because ICE determined that there was a reasonable likelihood of removal to Vietnam on June 9, 2025, Mascia Decl. ¶ 12, and Lu was already subject to a final order of removal, the Court is persuaded that any presumptively reasonable six-month detention to which the government may have been entitled accrued on June 9, 2025, and expires December 9, 2025. But "even if *Zadvydas*'s 'presumptively reasonable' six-month period of detention accrues only when a noncitizen is in detention, and even if [the presumptively reasonable period] remains at six months even though, as here, the government had a . . . pre-detention opportunity to arrange [Lu's] removal," any "presumption is rebuttable" and does not create a bright-line rule. *Zavvar*, 2025 WL 2592543, at *5.

At this stage, the Court cannot conclude that there is no significant likelihood that Lu will be removed to Vietnam in the reasonably foreseeable future, although it cautions the government that should Lu's detention continue without meaningful progress in obtaining travel documents, this determination may change. Given Lu's unsuccessful attempt to obtain travel documents from the Vietnam consulate in June 2025, and the consulate's lack of responsiveness between June and August 2025, Lu has presented evidence suggesting that Vietnam does not have any record of him, and, therefore, that he will be unable to receive travel documents from Vietnam, notwithstanding his interview with the consulate. *See* Liang Decl. ¶¶ 10–16; Emails to Consulate, ECF No. 16-2. This evidence is consistent with the government's unexpected delay in obtaining travel documents for Lu. After all, the government represented on multiple occasions that ICE typically receives travel documents within 30 days of submitting a request. *See, e.g.*, Resp. Ltr. I. Yet, over 75 days later, the government still has not obtained travel documents. It is also consistent with a long

8

history of Vietnam's refusal to issue travel documents for those who entered the United States from Vietnam before July 12, 1995. *See* Mascia Decl. ¶¶ 11, 12.

However, this is the first time the government has made a travel document request for Lu since June 2025, when ICE apparently rescinded its prior policy statement that "there was generally no significant likelihood of removal of Vietnamese citizens who arrived in the United States prior to July 12, 1995." *Id.* ¶ 12. On November 24, 2025, after over three months of detention, Lu interviewed with the Vietnamese consulate. Quizphi Decl. ¶ 3. Although the result of that interview remains unknown, *see id.* ¶ 5, the Vietnamese embassy has not affirmatively indicated that they refuse to issue travel documents for Lu or individuals like him. The government has also submitted evidence that in fiscal year 2025, Vietnam issued 296 travel documents for Vietnamese individuals who arrived in the United States before 1995. *Id.* ¶ 6.

Therefore, although Lu provided "good reason to believe there is no significant likelihood of removal in the reasonably foreseeable future," the government has sufficiently responded with evidence that Lu's travel document request is not languishing but is still being processed, albeit more slowly than anticipated. *Zadvydas*, 533 U.S. at 701. Therefore, the Court cannot conclude at this stage that there is "no significant likelihood of removal in the reasonably foreseeable future." *Id.* However, "for detention to remain reasonable, as the period of prior postremoval confinement grows, what counts as the 'reasonably foreseeable future' conversely would have to shrink." *Id.* Therefore, should Lu continue to be detained without a timely update that the Vietnamese government will provide Lu's travel documents by a date certain, Lu may be able to demonstrate that there is "no significant likelihood of removal in the reasonably foreseeable future." *Id.*

B. Bond Hearing

The Court considers whether Lu is nonetheless constitutionally entitled to a bond hearing. As is the practice in this Circuit, to determine the constitutionally necessary procedures to justify continued detention, the Court applies the *Mathews* three-factor balancing test to the individual circumstances of this case, declining to adopt a bright-line rule. *See Velasco Lopez*, 978 F.3d at 851; *Black*, 103 F.4th at 142, 145–48, 150; *Cabrera Galdamez*, 2023 WL 1777310, at *4 (applying *Mathews* to prolonged detention under § 1231(a)(6)); *see also Hamdi v. Rumsfeld*, 542 U.S. 507, 528–29 (2004) (applying *Mathews* to assess whether due process entitled an enemy combatant to an evidentiary hearing to contest the basis for his detention).

First, "the private interest affected by the official action is the most significant liberty interest there is—the interest in being free from imprisonment." *Velasco Lopez*, 978 F.3d at 851. The deprivation Lu is experiencing "while incarcerated [is], on any calculus, substantial. He [is] locked up in jail." *Id.* To make matters worse, the government has detained Lu at MDC. The particularly "dreadful" and "inhumane" conditions of confinement at MDC are no secret, exacerbating the severity of Lu's deprivation of liberty. *United States v. Chavez*, 710 F. Supp. 3d 227, 233 (S.D.N.Y. 2024) (citation omitted); *see also id.* at 238 n.20 (quoting the United States Attorney's Office's own statement that the conditions in New York City's jail system are "unsafe, dangerous, and chaotic").

Second, the second *Mathews* factor—"the risk of an erroneous deprivation of such [private] interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards," *Mathews*, 424 U.S. at 335—also weighs heavily in Lu's favor. The "procedures underpinning [Lu's] lengthy incarceration markedly increased the risk of error." *Velasco Lopez*, 978 F.3d at 852. Although the government may have reasonably believed that

10

Lu's removal was "imminent" on August 28, 2025, *see* Notice of Revocation of Release at 1; Opp. Mem. at 15, that proved false. The government has experienced significant, unexpected delays in obtaining travel documents for Lu and does not yet know when they will be delivered. *See* Quizphi Decl. ¶ 5; *see generally* Resp. Ltrs. I–III; *see also Velasco Lopez*, 978 F.3d at 855 ("While the Government's interest may have initially outweighed the short-term deprivation of [the petitioner's] liberty interest, that balance shifted once his imprisonment became unduly prolonged."). The government has now detained Lu at MDC for over three months without having made an individualized determination that Lu presented a danger to society or a risk of flight, and without providing him with a bond hearing before an impartial adjudicator. The government continues to detain Lu, even though it has experienced significant delays in obtaining travel documents beyond the time period identified in its own submissions to the Court, even though it has been unable to confirm whether the Vietnamese embassy has any record of Lu, and even though the outcome of Lu's interview with the Vietnamese consulate remains unknown.

As the period of confinement grows, "so do the required procedural protections no matter what level of due process may have been sufficient at the moment of initial detention." *Velasco Lopez*, 978 F.3d at 853 (citation omitted). The government argues that it has discretion to detain Lu under § 1236(a)(6). *See* Opp. Mem. at 13. But there is no dispute that ICE is required to adhere to the basic principles of due process when exercising its discretion. *See Velasco Lopez*, 978 F.3d at 850–51. Here, there is no indication that the government has exercised any discretion at all in continuing to detain Lu under these circumstances. Accordingly, "it appears to [the Court] that almost *any* additional procedural safeguards at some point in the detention would add value. The most obvious of these . . . would be an individualized bond hearing at which [an immigration

11

judge] can consider the noncitizen's dangerousness and risk of flight." *Black*, 103 F.4th at 153 (emphasis in original).

The third *Mathews* factor, the government's interest, also strongly favors Lu. The Court recognizes that "having to do something instead of nothing imposes an administrative and fiscal burden of some kind," but, as the Second Circuit has recognized, "retaining and housing detainees imposes substantial costs as well." *Black*, 103 F.4th at 154. For example, "the Department of Justice reported an average cost of detaining noncitizens, in 2019, of $88.19 per prisoner per day," and "[o]ther estimates have placed the cost as high as $134 per day." *Id.* (citations omitted); *see also Sajous v. Decker,* 18 Civ. 2447, 2018 WL 2357266, at *13 (S.D.N.Y. May 23, 2018) (concluding that the government is "unlikely to suffer any harm," as there is "nothing in the record to suggest that granting a bond hearing . . . will strain ICE resources or undermine its effective enforcement of immigration laws").

Furthermore, the government's "regulatory interest in continuing to detain [Lu] without a bond hearing is weak because his continued detention [appears to be] not well-aligned with either fundamental purpose of detention: mitigating flight risk or preventing danger to the community." *Cabrera Galdamez*, 2023 WL 1777310, at *7 (citing *Zadvydas*, 533 U.S. at 690). Indeed, Lu has provided significant evidence that "the Government might find difficult to overcome if it had to demonstrate affirmatively that [Lu] poses a risk of flight or danger to the community necessitating his continued detention." *Jimenez v. Decker*, No. 21 Civ. 880, 2021 WL 826752, at *9 (S.D.N.Y. Mar. 3, 2021) (citation omitted). The government already released Lu for 25 years under supervision following the entry of a final order of removal, and Lu demonstrated perfect compliance with his OSUP during this time. Reply at 22; Liang Decl. ¶ 20. Moreover, the government concedes that Lu is "amenable to deportation." Mascia Decl. ¶ 14. The notes from

Lu's August 28 interview before he was detained state that he is the sole financial provider for his family, minimizing the risk of flight. *See* Informal Interview Notes at 1. "Where the noncitizen poses no danger and is not a flight risk, all the government does in requiring detention is 'separate[] families and remove[] from the community breadwinners, caregivers, parents, siblings, and employees.'" *Black*, 103 F.4th at 154 (quoting *Velasco Lopez*, 978 F.3d at 854–55).

Ultimately, arranging removal in this case has unexpectedly taken over three months, and there is no guarantee that Lu will be removed imminently. After their initial estimate of 30 days proved inaccurate, the government failed to provide a time frame for Lu's removal. Two days before a scheduled hearing in the matter, the government stated for the first time that "if an interview is required, the Government of Vietnam has historically issued travel documents within thirty days from the time an interview is conducted by the Vietnamese consulate." Quizphi Decl. ¶ 9. At the same time, however, the government concedes that, although they expect a decision soon, a "decision on the issuance of travel documents for Lu by the government of Vietnam" has not yet been made. *Id.* ¶ 5. The Court has reason to be concerned that Lu's travel document request is atypical and may continue to drag: a clerk from the Vietnamese consulate previously informed Lu that there are no records of him in their system. Liang Decl. ¶ 10. Moreover, the government's prior representations to the Court regarding the expected timeline for removal have proven inaccurate and incomplete. *See, e.g.*, Opp. Mem. at 5 ("It typically takes approximately 30 days to obtain travel documents from the Vietnamese embassy once the request is submitted."); *id.* at 15 (stating that "there exist no impediments" to obtaining travel documents); Resp. Ltr. I (stating, on October 30, 2025, that "ICE anticipates receiving travel documents for Petitioner in short order"); Resp. Ltr. II (stating, without mentioning the prospect of an interview, that "ICE's understanding is that Vietnamese authorities will check for records of Petitioner and, if they have

13

them, simultaneously issue travel documents for Petitioner"); Resp. Ltr. III (mentioning an interview for the first time, with no indication of when the interview will be conducted and how many other steps are entailed in the process to obtain travel documents). In the best case, even if the government's predictions are accurate this time, if Lu is not a risk of flight or a safety risk, his prolonged detention while the government waits to receive the documents and make the final arrangements for his removal serves little purpose. *Cabrera Galdamez*, 2023 WL 1777310, at *7.

Therefore, under these circumstances, the *Mathews* factors do not weigh in favor of Lu's continued detention without a bond hearing, and the Court concludes that a bond hearing is required. "Where the government seeks to continue depriving a person of their liberty . . . [the Court] must require the government to bear the burden of proving the need for continued detention." *Black*, 103 F.4th at 155. "The overwhelming majority of courts have concluded . . . that when unreviewed detention has become unreasonable, the government must bear the burden of proof at a bond hearing by clear and convincing evidence, to ensure the preservation of the detainees' fundamental liberty interests." *Joseph v. Decker*, No. 18 Civ. 2640, 2018 WL 6075067, at *12 (S.D.N.Y. Nov. 21, 2018) (collecting cases) (cleaned up); *see also Black*, 103 F.4th at 157 ("Where an individual's liberty is at stake, the Supreme Court has consistently used this evidentiary standard for continued detention."); *Cabrera Galdamez*, 2023 WL 1777310, at *8; *Velasco Lopez*, 978 F.3d at 855–57. "Consideration of alternative conditions of release [to ensure Lu's appearance], as well as [his] ability to pay a bond, is similarly consistent with due process." *Cabrera Galdamez*, 2023 WL 1777310, at *9.

## CONCLUSION

For the foregoing reasons, the Petition is GRANTED IN PART.

The government is ordered to hold a bond hearing in accordance with this decision by **December 15, 2025,** or release Petitioner on his own recognizance. At that hearing, the government shall bear the burden of demonstrating by clear and convincing evidence that Petitioner is either a danger to the community or a risk of flight, and the judge must consider Petitioner's ability to pay for a bond and the alternatives to detention for assuring Petitioner's appearance. By **December 16, 2025,** the government shall file a letter certifying its compliance with this order by (i) confirming that the bond hearing was held and that the immigration judge applied the proper legal standard, and (ii) stating the outcome of the bond hearing.

SO ORDERED.

Dated: December 8, 2025
         New York, New York

_____
ANALISA TORRES
United States District Judge